IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of, | ) | |
| | ) | No. 35292-7-III |
| LORI VAN DE GRAAF, | ) | (Consol. with Nos. 35499-7-III, |
| | ) | 35839-9-III, & 36283-3-III) |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ROD D. VAN DE GRAAF, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — This is *Van de Graaf IV*. *See In re Marriage of Van de Graaf*, no. 35133-5-III (Van de Graaf I), for details. These four consolidated cases involved in this appeal generally revolve around contempt and modification rulings stemming from the dissolution decree at issue in the first appeal. We affirm the trial court and award respondent Lori Van de Graaf (Lori) her attorney fees for responding to these four consolidated cases.

PROCEDURAL HISTORY

As stated in previous opinions, the underlying facts are known to the parties and will not be recited here, although interested persons can find some of the information in our *Van de Graaf I* opinion. After five years of litigation, the trial court entered a decree

of dissolution that is the primary topic of Van de Graaf I.  Aspects of the decree that figure into this appeal include the trial court's directives that appellant Rod Van de Graaf (Rod) pay his former wife $6,000 per month in maintenance, contribute to the college expenses of their younger son, and make a transfer payment of approximately $1.17 million to Lori in order to equalize the property distribution.  Rod also was awarded the family home.

Rod appealed the decree (Van de Graaf I) in March 2017.  He thereafter initially declined to make any of the noted payments, eventually claiming an inability to pay despite receiving several million dollars in assets under the decree.  Superior court commissioner Elisabeth Tutsch ordered in June 2017, that Rod advance "suit money" to Lori in light of his failure to pay her while funding extensive post-decree litigation in the trial and appellate courts.[1]

The failure to make maintenance and college support payments led Lori to seek enforcement of the decree by repeated motions for contempt.  In response to the first motion, Rod moved to modify the maintenance award five weeks after the decree was filed.[2]  In support of his motion to modify the spousal maintenance award, Rod argued that his monthly income had been reduced to $7,800 from the $17,000 monthly average

---

[1] We upheld the suit money awards in Van de Graaf II.
[2] He also sought to vacate the decree due to concerns about the ownership of the life insurance policies awarded to him.  We rejected that argument in Van de Graaf I.

used by the court in setting the award.[3] The dissolution trial judge, the Honorable

Michael McCarthy, found Rod in contempt and issued a bench warrant for his arrest on

April 14, 2017, due to "willful failure to pay spousal maintenance" since the previous

November. Judge McCarthy also denied the motion to modify. Clerk's Papers (CP) (no.

35133-5-III) at 963-965. The order also indicated that Rod could purge the contempt by

complying with the decree for six consecutive months. The warrant was quashed three

days later after Rod paid the arrears.

Commissioner Tutsch found Rod in contempt again on May 31, 2017, due to

failure to pay that month's maintenance. Rod purged that contempt order by making the

payment, advising the court that he had to borrow money to do so.

Lori sought suit money from Rod in June 2017. In late August, Commissioner

Tutsch awarded Lori $30,000 of the requested $65,000 in suit money and also found Rod

in contempt for failing to make the July and August maintenance payments. Rod failed

to pay any of the suit money, leading to a contempt motion in November. Rod made the

same financial argument to the commissioner that he had made to Judge McCarthy in the

spring—his income had been reduced to $7,800 per month. He alleged the $6,000

---

[3] The financial arrangements are discussed more fully in Van de Graaf I. Rod and his siblings operated a business, Midvale, that managed their parents' cattle business. The reduction in income was attributed to a decline in cattle prices, but, as we discussed in Van de Graaf I, a significant asset of Midvale's was diverted to pay for Midvale's purchase of the parents' business operations as part of the senior Van de Graafs' estate planning.

monthly maintenance payment to Lori left him insufficient income to pay other expenses, although he had been able to borrow funds to pay $38,000 to Lori in order to bring his maintenance arrearages up to date. On December 7, 2017, Commissioner Tutsch found Rod[4] in contempt of court. Rod was ordered to make the $30,000 payment by December 22 and was also assessed $1,000 in costs. He did not appeal that ruling.

He paid Lori's attorneys $10,000 on December 22 that he borrowed from his sister. He also sought to supersede the judgments against him by using the former family home as collateral.[5] Meanwhile, Lori conducted a debtor's examination as part of supplemental proceedings in January 2018. Her renewed motion for contempt was heard by Commissioner Tutsch that same month.[6] The commissioner rejected Rod's poverty claim "on the same basis that Judge McCarthy entered the decree," concluding that "he has contemptuously, willfully disregarded the orders that had been entered." Report of Proceedings (RP) (no. 351335) at 1176. "I don't accept that he is unable to pay those orders." *Id*.

---

[4] Rod's appellate attorney was found in contempt in August 2018, due to a billing records discovery dispute and was ordered to pay $750 to Lori's trial attorney to cover expenses related to a deposition. In Van de Graaf I, we denied Lori's request to have Rod's attorneys pay the attorney fees owed her counsel.

[5] A supersedeas bond subsequently was approved in February 2018.

[6] Our record shows that financial information disclosed during the debtor's examination was filed in superior court until the following month, making it unlikely that any of it was before the court during the January contempt hearing.

On January 22, 2018, the commissioner ordered Rod to pay the remaining $20,000 and suspended a five day jail sentence on condition that payment be made by January 31, 2018. The court also approved use of the former family home as alternate security conditioned on the filing of a supersedeas bond. The contempt order begat an unsuccessful series of "emergency" motions to this court and the Washington Supreme Court as Rod sought to stay the jail sentence. The appellate court commissioners also concluded that Rod had failed to prove his claim of inability to pay. During this period, Lori's attorneys began seeking information concerning the amount spent by Rod for his appellate attorneys and other post-decree litigation.

Additional contempt orders were entered by Commissioner Tutsch on March 22 and July 18, 2018, with the commissioner reiterating her findings that she found the claim of inability to pay unproved. Lori demonstrated that by June 8, 2018, Rod's appellate attorneys had been paid the sum of $230,438.66.[7] Lori was awarded an additional $80,000 in suit money. In response to Lori's motions to enforce the contempt rulings, Commissioner Tutsch ordered Rod to begin serving the previously suspended five day jail sanction. He did so beginning July 27, 2018.

Rod's appeal from the April 14, 2017 contempt and modification orders was assigned cause no. 35292-7-III. The January 22, 2018 jail sanction order was separately

---

[7] *See* Appendices A and B to Lori's Reply to Motion to Dismiss filed under cause no. 35133-5-III on October 15, 2018.

appealed and assigned cause no. 35839-9-III. He also appealed from Judge McCarthy's July 10, 2018 order denying revision of Commissioner Tutsch's May 31 contempt order. That appeal was assigned no. 35499-7-IIII. Rod also appealed the July 18, 2018 incarceration order. That matter was assigned cause no. 36283-3-III.

After originally being consolidated in different manners, the four noted files were reconsolidated under 35292-7-III. The panel that heard the first three Van de Graaf cases considered the consolidated Van de Graaf IV appeals, along with issues reserved by the first case, on the court's August 12, 2019 nonargument docket.

## ANALYSIS

This appeal addresses the 2017 modification ruling that was reserved from Van de Graaf I, as well as the various contempt rulings recited above. We initially note standards of review common to both issues. We will then turn to the modification ruling before considering Rod's arguments that he lacked the ability to pay and that jail was an improper punitive sanction rather than a permissible coercive sanction. Finally, we consider Lori's request for attorney fees on appeal.

*Common Matters*

After noting some standards governing our review of this case, we briefly turn to Lori's motion to dismiss these appeals for mootness.

The overriding issue in this appeal is a factual one. Accordingly, consideration of the rules governing review of factual findings and credibility determinations is in order.

6

No. 35292-7-III, 35499-7-III, 35839-9-III, 36283-3-III)
*In re Marriage of Van de Graaf*

Those rules can be clearly stated: appellate courts defer to the trial court's credibility determinations and do not reweigh evidence even if reviewing courts would have resolved conflicting evidence differently. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959); *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). Stated another way, an appellate court is not in a position to find persuasive evidence that the trier of fact found unpersuasive. *Quinn*, 153 Wn. App. at 717.[8]

This court reviews a trial court's decision following a bench trial to determine whether substantial evidence supports any challenged findings and whether the findings support the conclusions of law. *State v. Hovig*, 149 Wn. App. 1, 8, 202 P.3d 318 (2009). "Substantial evidence" is sufficient evidence to persuade a fair-minded person of the truth of the declared premise. *Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc.*, 102 Wn. App. 422, 425, 10 P.3d 417 (2000). In determining the sufficiency of evidence, an appellate court need only consider evidence favorable to the prevailing party. *Bland v. Mentor*, 63 Wn.2d 150, 155, 385 P.2d 727 (1963). Conclusions of law are reviewed de novo. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

---

[8] These standards acknowledge that the written word does not always faithfully convey the import of spoken language, nor do words alone reflect the speaker's true meaning. "Fair speech may hide a foul heart." J.R.R. Tolkien, *The Two Towers*, 360 (Ballantine Books 1972) (1955). Whether fair words reflect a fair heart, let alone the truth of the assertion, is a matter on which we must defer to the trial judge.

7

Appellate courts accord trial courts deference in a number of areas, including, as noted above, the weight to be given to evidence. Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). In a bench trial, judges are presumed to follow the law and to consider evidence solely for proper purposes. *State v. Adams*, 91 Wn.2d 86, 93, 586 P.2d 1168 (1978); *State v. Miles*, 77 Wn.2d 593, 601, 464 P.2d 723 (1970); *State v. Bell*, 59 Wn.2d 338, 360, 368 P.2d 177 (1962).

Lori argues that this appeal should be dismissed as moot, arguing that Rod's inability to pay argument has been rejected on multiple occasions by both this court and the Washington Supreme Court and that no effective relief could be granted Rod since he has served his five day jail sanction.[9] The first of those arguments addresses either issue or claim preclusion, something that does not exist in the absence of a final judgment. *See generally*, Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. L. REV. 805 (1985). Whether facts support interlocutory review is a totally different question than whether the evidence at trial supported the factual determination. Her first argument is unpersuasive. The second might technically be true, but the earlier orders of contempt still have meaning and, in light of the behavior to date, the trial court would benefit from confirmation of its ability to order incarceration under

---

[9] Her related motion to dismiss all of the appeals due to intransigence and lack of diligence in prosecuting them was denied in Van de Graaf I.

these circumstances. Accordingly, we deny the motion and now turn to the issues

presented by the appeal.

*Modification*

Rod's appeal of the denial of his motion for modification of the maintenance

obligation was deferred from Van de Graaf I to this case, primarily because the

maintenance issue led to the initial contempt rulings. We conclude that the trial court did

not abuse its discretion.

In accordance with RCW 26.09.170(1), maintenance may only be modified upon a

showing of "a substantial change in circumstances that the parties did not contemplate at

the time of the dissolution decree." *In re Marriage of Spreen*, 107 Wn. App. 341, 346, 28

P.3d 769 (2001*)*. "The phrase 'change in circumstances' refers to the financial ability of

the obligor spouse to pay vis-à-vis the necessities of the other spouse." *Id.* (quoting *In re*

*Marriage of Ochsner*, 47 Wn. App. 520, 524, 736 P.2d 292 (1987)). Whether

modification should be granted is reviewed for abuse of discretion. *In re Marriage of*

*Drlik*, 121 Wn. App. 269, 274, 87 P.3d 1192 (2004).

Here, the trial court did not grant the petition for modification because it was not

convinced that there had been a change in circumstances.[10] The trial court originally had

determined that Rod's monthly income was $17,000 and ordered that he pay $6,000 to

_____

[10] Accordingly, we need not consider whether Rod established the other
requirements for modifying his maintenance obligation.

9

Lori every month as spousal maintenance. We upheld that award in Van de Graaf I.

Only five weeks after the trial court's oral ruling was committed to paper, Rod sought to

modify based on an uncontemplated change in circumstances—the reduction of his

income to $7,800 per month after he and his siblings eliminated their monthly "equity

draws" from Midvale.[11]

As we noted previously, this court cannot find persuasive evidence that the trial

court determined was unpersuasive. *Quinn*, 153 Wn. App. at 717. That simple

proposition controls our analysis just as it undermines Rod's. The trial court did not

believe the income was reduced. We cannot reweigh Rod's evidence and come to a

different conclusion.

That recognition is sufficient to resolve this issue (and the next one), but we also

note that the evidence amply backs the trial court. The reduction in income appears to be

a voluntary decision resulting from the diversion of the manure asset and the desire to

fund the senior Van de Graafs' estate plan. The voluntary choice to fund other projects is

not a significant and unanticipated change in circumstances.

---

[11] Although his initial request was poorly supported, Rod later marshalled additional evidence in support of his argument during the contempt proceedings. Since we must address his more complete arguments with respect to the contempt contentions, we consider that same evidence at this time rather than limit Rod to his initial showing.

In addition, the decision to spend[12] what now is likely more than a quarter million dollars to appeal while initially claiming inability to pay any obligations under the decree and then refusing to even advance the remaining $20,000 of the original suit money award supports the view that the alleged inability to pay is a choice rather than impecunity. This view is also consistent with the intransigent behavior demonstrated by Rod throughout this litigation. He has acted to make the process as financially difficult for Lori as possible by driving up expenses and limiting her income.

Understandably, the trial court concluded that the income reduction was voluntary rather than unanticipated. This, also, was a very tenable basis for denying the motion to modify the support obligation. The court did not err.

*Inability to Pay*

Rod challenges the court's contempt findings on the basis that he lacked the present ability to pay. His argument fails, largely for the reasons just noted.

Contempt of court is the intentional disobedience of a lawful court order. *In re Humphreys*, 79 Wn. App. 596, 599, 903 P.2d 1012 (1995) (citing RCW 7.21.010(1)(b)). In a dissolution proceeding, the court has the authority to enforce its decree and orders in a contempt proceeding. *In re Marriage of Matthews*, 70 Wn. App. 116, 126, 853 P.2d

---

[12] If he genuinely is using borrowed funds for the appeal, that fact only compounds his sins. He is using a loan for a discretionary appeal instead of complying with mandatory court orders.

462 (1993).[13] Inability to comply with the court order is a defense if the person is unable to comply through no fault of his own. *Britannia Holdings Ltd. v. Greer*, 127 Wn. App. 926, 933-934, 113 P.3d 1041 (2005). A party resisting a finding of civil contempt bears the burden of production as well as the burden of persuasion regarding any claimed inability to comply with the court's order. *Moreman v. Butcher*, 126 Wn.2d 36, 40, 891 P.2d 725 (1995). When the civil contempt involves payment of a specific sum of money, the court must find that the party has control of sufficient assets to comply with the order, although the court need not identify a specific funding source. *Britannia Holdings*, 127 Wn. App. at 934. A finding of contempt is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *In re Marriage of Eklund*, 143 Wn. App. 207, 212, 177 P.3d 189 (2008).

Rod argues that the court erred in two respects: (1) it relied on the financial information from the time of the dissolution rather than his present reality, and (2) it wrongly considered his family's ability to support him as a source of payment. Neither error existed.

Rod's first argument unnecessarily focuses on his present *income* instead of his present *ability* to pay. The decree awarded him roughly $3.9 million in assets,[14]

---

[13] Child support and visitation issues are subject to RCW 26.09.160.

[14] Since Rod had not complied with the requirement that he transfer $1.17 million to Lori, the entire property award is properly considered in adjudging his *ability* to pay.

including the sole income-producing asset, Midvale. Even if the court had accepted Rod's claim that his income had been reduced to $7,800 a month, it was not required to ignore the rest of his financial holdings. In considering ability to pay, the trial judge knew that Rod held assets worth nearly $4 million, was making at least $93,600 per year, had practically no expenses, and was spending tens of thousands of dollars to litigate the case. Those were the facts governing nearly each and every one of the contempt hearings at issue here.[15] Any trial judge could find present ability to pay the initial suit money award or the monthly support obligations that were the subjects of the numerous contempt hearings.

There was no error in finding a present ability to pay. For these reasons, and those discussed previously, Rod's defense of inability to pay was also unavailing. Thus, the first challenge fails.

The second challenge is largely based on an ancient case that is neither legally nor factually apropos, *Holcomb v. Holcomb*, 53 Wash. 611, 102 P. 653 (1909). Although Rod spends a great deal of time arguing *Holcomb*, we need not spend much time with it. *Holcomb* comes from a time when the appellate courts exercised de novo consideration of the facts, something no longer done. *Thorndike*, 54 Wn.2d at 575. *Holcomb* is no

---

[15] The house was not encumbered by the supersedeas bond until February 2018, after the initial contempt orders. Rod's remaining assets, including the $2 million interest in Midvale, were never encumbered.

longer good law on the topic of appellate court reweighing of factual matters. Moreover, the rule of law Rod would draw from that case—that courts cannot consider borrowing capacity—did not long exist, if *Holcomb* ever even stood for that proposition. *See Croft v. Croft*, 77 Wash. 620, 624, 138 P. 6 (1914) (loan received, but not used toward dissolution decree obligations, considered evidence of ability to pay); *accord Hubbard v. Hubbard*, 130 Wash. 593, 228 P. 692 (1924) (court faulted father in contempt action for making only one attempt to borrow funds to pay decree obligations).

The trial court could have considered Rod's ability to obtain loans to pay his obligations, whether that money came from family or commercial lenders. To the extent it was even considered here, however, it was in the context of Rod choosing to spend money he supposedly did not have on something that he was not required to do. If he could not afford the entire costs of scorched earth litigation, he should not have lit the first match.

The trial court had tenable bases on which to conclude Rod had the ability to pay each of the various contempt orders it entered. There was no abuse of discretion.

*Incarceration*

Rod also challenges the court's imposition of a five day jail sanction, arguing that it was punitive rather than coercive in nature, and therefore improper. We disagree.

The primary thrust of Rod's argument is one that we have already rejected—that the court did not consider only his ability to pay, but included that of his family members

as well. Noting the fact that Rod's family would pay the bills when push came to shove is not the same thing as looking to the family's ability to pay. The record amply supports the conclusion that *Rod* had the ability to pay.

Moreover, the contempt order truly was coercive rather than punitive. Remedial sanctions are authorized by RCW 7.21.030, also referred to as "civil contempt." *In re Det. of Young*, 163 Wn.2d 684, 693 n.2, 185 P.3d 1180 (2008). A "remedial sanction" is one which is "imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform." RCW 7.21.010(3).

RCW 7.21.030(2), in relevant part, outlines the possible remedial sanctions available for contempt:

> If the court finds that the person has failed or refused to perform an act that is yet within the person's power to perform, the court may find the person in contempt of court and impose one or more of the following remedial sanctions:
>     (a) Imprisonment if the contempt of court is of a type defined in RCW 7.21.010(1)(b) through (d). The imprisonment may extend only so long as it serves a coercive purpose.
>     (b) A forfeiture not to exceed two thousand dollars for each day the contempt of court continues.
>     (c) An order designed to ensure compliance with a prior order of the court.

Punitive sanctions are authorized by RCW 7.21.040, also known as "criminal contempt." *Smith v. Whatcom County Dist. Court*, 147 Wn.2d 98, 105, 52 P.3d 485 (2002). "'Punitive sanction' means a sanction imposed to punish a past contempt of

court for the purpose of upholding the authority of the court." RCW 7.21.010(2). If a court seeks to impose punitive sanctions, a prosecutor must file a complaint or information and certain other procedures must be followed that are generally consistent with a criminal case. RCW 7.21.040(2).

> [A] sanction is punitive if there is a determinate sentence and no opportunity to "purge" the contempt. . . . [I]t is remedial where it is indeterminate and the contemnor is released upon complying with the court's order. A punitive sanction generally is imposed to vindicate the court's authority, while a remedial sanction typically benefits another party.

*Rhinevault v. Rhinevault*, 91 Wn. App. 688, 694, 959 P.2d 687 (1998) (internal citations omitted).

Noting the fixed nature of the penalty and the lack of protections required for criminal contempt, Rod argues that the court erred in imposing the jail sanction. Because the incarceration was not for a past offense, it was not criminal in nature.

A critical factor in distinguishing between civil and criminal contempt is the triggering mechanism for the sanction. If the purpose of the sanction is to force a person to do something, it is coercive and hence "remedial." *In re Pers. Restraint of King*, 110 Wn.2d 793, 799-800, 756 P.2d 1303 (1988). Where a sanction is imposed for past conduct, it typically is punitive. *Id.* A civil sanction "is conditional and indeterminate, *i.e.*, where the contemnor carries the keys of the prison door in his own pocket and can let himself out by simply obeying the court order." *Id.*

16

Here, Rod was given plenty of time to pay up. The court repeatedly considered his argument that diminished income left him without ability to afford his obligations, but was, in each instance, unconvinced and unmoved. Having determined there was an ability to pay, the court imposed a sanction that could be avoided by complying with the existing order. Since Rod had the opportunity to purge the contempt, it was civil in nature. *Rhinevault*, 91 Wn. App. at 694.

The court did not erroneously impose a criminal contempt sanction in place of a civil contempt sanction. There was no abuse of the court's considerable discretion in ascertaining Rod's ability to pay.

*Attorney Fees*

Lastly, we take up Lori's request that attorney fees be imposed due to Rod's intransigence. We granted a similar request in the first two Van de Graaf appeals, but denied her request in the third case. We also grant the request here.

There is little need to recite the bases for our ruling since we have done that in the first two cases. Having affirmed the trial court's determination that Rod was willfully refusing to pay his obligations, it necessarily follows that these appeals further demonstrate the intransigence previously found.[16] In light of the trial court's factual

---

[16] We are not finding the appeals to be frivolous. Although a very weak argument, Rod at least could assert that he was the victim of a financial downturn and could no longer afford the appeal he had put in motion. We also need not reach the issue of whether attorney fees should be imposed under the contempt statute, RCW 7.21.030(3).

17

findings, these appeals are nothing more than Rod's latest attempts to avoid meeting his obligations to his former wife.

We grant Lori her reasonable attorney fees for the briefing and motions filed under these four cause numbers, subject to her timely compliance with RAP 18.1.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Siddoway, J.

18