[No. 54186–8.   En Banc.   June 23, 1988.]

*In the Matter of the Personal Restraint of* DAWSON KING,
*Respondent,* THE DEPARTMENT OF SOCIAL
AND HEALTH SERVICES, *Petitioner.*

*Kenneth O. Eikenberry, Attorney General,* and *Maureen McGuire, Assistant,* for petitioner.

*Dawson King,* pro se, and *Mark E. Wilson* of *University Legal Assistance,* for respondent.

UTTER, J.—The Department of Social and Health Services (DSHS) seeks reversal of a Court of Appeals decision ordering Dawson King to be released from jail. Mr. King had been found in contempt of court by the juvenile court in June 1986 for disobeying its order to bring his young son,

Jason, to a dependency hearing; he was jailed indefinitely until he complied with the order. Approximately 1 year later, the Court of Appeals granted Mr. King's personal restraint petition, holding that the incarceration had become punitive rather than coercive as a matter of law. We reverse the Court of Appeals and reinstate the warrant of commitment pending further proceedings in the trial court.

Jason and Levi, the twin boys of Dawson and Sarah King, were born in March 1985 in Spokane. In December 1985, while Mrs. King was in an inpatient psychiatric facility, Mr. King took the children to Idaho and left them with relatives. Shortly thereafter, Levi suffocated after allegedly being trapped between a mattress and a wall. An examination revealed broken bones and a skull fracture believed to have occurred in November 1985. Because of the nature of Levi's injuries, Jason was also examined at the request of Idaho authorities and found to have a broken arm, spiral fracture of one leg and a skull fracture. The daughter of a babysitter later claimed to have fallen down the stairs while carrying both children. The record does not reveal whether criminal charges were filed.

After Levi's death, Mr. King brought Jason back to the Colville area. On February 2, 1986, a caseworker from DSHS contacted Mr. King and informed him of Jason's need for follow-up treatment. Mr. King brought his son to the hospital and an examination revealed only the old injuries. The hospital released Jason to his father.

On February 14, 1986, Sarah King, who had by then become a patient in the psychiatric ward of Sacred Heart Hospital in Spokane, made a complaint to the Child Protective Services (CPS) alleging that Mr. King had abused the boys. Specifically, she claimed that he had violently spanked them, put tape over their mouths and dunked them in cold water to stop their crying. She stated that these events occurred when the twins were approximately 3 months old and when they were still on a heart monitoring system due to respiratory ailments.

In response to this complaint, a CPS caseworker met with Mr. King at his home on February 14, 1986. Mr. King denied his wife's allegations and refused to produce Jason. He stated that Jason was in Spokane with a babysitter but otherwise refused to disclose his location. The caseworker asked to meet with the babysitter to ensure the child's safety and Mr. King agreed to meet with the caseworker that evening in Spokane with Jason. However, Mr. King failed to appear. DSHS filed a dependency petition. A shelter care order was signed on February 19, 1986, alleging the child to be abused or neglected. A hearing was set for April 4, 1986.

Sometime after Sarah's release from the hospital in late March, Dawson and Sarah King apparently moved to Utah. On March 21, however, an attorney appeared for Mr. King in the dependency petition proceeding. The original hearing date was continued to May 23. On April 30, the Kings' attorney filed an answer to the petition challenging the juvenile court's jurisdiction over them since they were now Utah residents. The court rejected the Kings' argument that it lacked jurisdiction and gave them a choice: either disclose Jason's exact location and have that state take jurisdiction or produce the child to the court within 30 days and submit to the jurisdiction of Stevens County.

The Kings chose the latter course but did not comply with the order to produce the child. Instead, Sarah King submitted an affidavit recanting the allegations of child abuse she had made in her February 1986 complaint. On June 25, 1986, the court ordered the Kings to appear on June 27 to show cause why they should not be held in contempt of court. Once again the Kings appeared and refused to inform the court as to Jason's location. Pursuant to its general civil contempt powers in RCW 7.20.110 and the juvenile dependency statute (RCW 13.34.070), the court ordered the Kings jailed until such time as they revealed the location of their son. As of this writing, the child's whereabouts and well being are not known.

Mrs. King was released shortly after the contempt order when the court was advised that she did not know Jason's location. Mr. King remained in the Stevens County Jail. He made no subsequent appearance before the court for the purpose of purging the contempt. On January 9, 1987, Mr. King filed a personal restraint petition and jurisdiction appeal with Division Three of the Court of Appeals. That court upheld the juvenile court's jurisdiction over the matter, *King v. Department of Social & Health Servs.*, 47 Wn. App. 816, 821–24, 738 P.2d 289 (1987), and that issue is not directly before this court. However, the Court of Appeals granted the personal restraint petition and terminated the order of confinement. *King,* at 827. We granted the DSHS petition for review.

## I

We first address the issue of the appropriate source of a trial court's contempt powers in coercing compliance with a lawful order involving the welfare of minor children. The question here is whether a trial court's general contempt power, as provided in RCW 7.20.110,[1] is circumscribed by the specific contempt provision of the juvenile dependency statute, RCW 13.34.165.[2] The Court of Appeals did not rule on this issue, holding that under either contempt provision, the trial court had exceeded its authority. *King,* at 826.

Intentional disobedience of a lawful court order is contempt. *Mathewson v. Primeau,* 64 Wn.2d 929, 934, 395 P.2d 183 (1964); *State v. Norlund,* 31 Wn. App. 725, 728, 644

---

[1]RCW 7.20.110 provides:

"When the contempt consists in the omission or refusal to perform an act which is yet in the power of the defendant to perform, *he may be imprisoned until he shall have performed it,* and in such case the act must be specified in the warrant of commitment." (Italics ours.)

[2]RCW 13.34.165 provides, in part:

"(1) Failure by a party to comply with an order entered under this chapter is *punishable* as contempt.

"(2) Contempt under this section is *punishable* by confinement for up to seven days." (Italics ours.)

P.2d 724 (1982). A juvenile court has authority to incarcerate a contemnor for the purposes of compelling compliance. *State v. Martin,* 36 Wn. App. 1, 4, 670 P.2d 1082 (1983), *rev'd on other grounds,* 102 Wn.2d 300, 684 P.2d 1290 (1984). Whether contempt is warranted in a particular case is a matter within the sound discretion of the trial court; unless that discretion is abused, it should not be disturbed on appeal. *Schuster v. Schuster,* 90 Wn.2d 626, 630, 585 P.2d 130 (1978).

RCW 13.34.040–.110 of the juvenile dependency statute sets forth the procedures to be employed by the court when deciding whether a dependent child should be taken into the custody of the State and given shelter care. RCW 13.34.050 authorizes the court to take a child into custody upon finding "reasonable grounds to believe . . . that the child's health, safety, and welfare will be seriously endangered if not taken into custody." Upon issuing a summons to the parents, the court may order them to bring the child to the hearing. RCW 13.34.070(4). A parent who fails to comply with such an order "may be proceeded against as for contempt of court." RCW 13.34.070(6). The scope of a court's contempt powers in such instances is not defined.

In this case, the trial court utilized the provisions of RCW 13.34.070 and ordered the Kings to bring Jason to the shelter care hearing. When the Kings did not bring Jason to the hearing on the date ordered, the court found both parents guilty of contempt and sentenced them to jail until such time as they complied. The order of contempt and warrant of commitment ordered King's incarceration until such time as he

> shall disclose the specific location of the child, Jason King, and such disclosure is verified by the DSHS/DCFS, and the child . . . is placed in shelter care in Washington State or other equivalent protective custody in another state. No Bond is permitted.

Clerk's Papers, at 71–72. The court cited the general civil contempt statute in RCW 7.20.110 as authority for its order.

Mr. King contends that the court's contempt power is restricted by the specific contempt provision in the juvenile dependency statute (RCW 13.34.165), which limits incarceration for contempt to 7 days. RCW 13.34.165(2). Petitioner DSHS maintains that RCW 13.34.165 is not an exclusive remedy for all violations of court orders issued in the context of child support and dependency proceedings; a trial court retains its general authority to impose contempt sanctions on traditional grounds. Thus, under the general civil contempt statute, the duration of incarceration may be unlimited. RCW 7.20.110.

Where two statutes are in apparent conflict, this court will, if possible, reconcile them to the end that each may be given effect. *In re Mayner*, 107 Wn.2d 512, 522, 730 P.2d 1321 (1986). Although the difference between the two contempt provisions is substantial, any conflict between the two provisions is more apparent than real. The two provisions reflect the two fundamentally different types of contempt sanctions, civil and criminal; hence, they are complementary and not mutually exclusive tools at the court's disposal to achieve different purposes. A careful analysis of the distinctions between civil and criminal contempt leads us to conclude that the contempt provision in RCW 13.34.165(2) is punitive, hence criminal, in nature and does not preclude a court from exercising its coercive powers under the general civil contempt statute, RCW 7.20.110.

In determining whether a particular contempt sanction is civil or criminal, we look to the substance of the proceeding and the character of the relief that the proceeding will afford. If the purpose of the contempt sanction is punitive and results in a determinate jail sentence, with no opportunity for the contemnor to purge himself of the contempt, it is criminal. If the purpose of the sanction is to coerce compliance with a lawful court order, and a contemnor is jailed only so long as he fails to comply with such order, then the contempt is civil. *State v. Browet, Inc.*, 103 Wn.2d 215, 218, 691 P.2d 571 (1984).

A civil contempt sanction is coercive and remedial, and is typically for the benefit of another party; a criminal sanction is punitive and is imposed for the purpose of vindicating the authority of the court. As the United States Supreme Court stated years ago:

> The distinction between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden,—punished by imprisonment for a definite term; is sound in principle, and . . . affords a test by which to determine the character of the punishment.

*Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 443, 55 L. Ed. 2d 797, 31 S. Ct. 492 (1911). In summary, a contempt sanction is criminal if it is determinate and unconditional; the sanction is civil if it is conditional and indeterminate, *i.e.,* where the contemnor carries the keys of the prison door in his own pocket and can let himself out by simply obeying the court order. *In re Nevitt,* 117 F. 448, 461 (8th Cir. 1902); *Shillitani v. United States,* 384 U.S. 364, 16 L. Ed. 2d 622, 86 S. Ct. 1531 (1966). The purpose of a criminal contempt sanction is to punish for past behavior; the purpose of a civil contempt sanction is to coerce future behavior that complies with a court order.

Although a court has statutory as well as inherent power to impose a civil contempt sanction, *Keller v. Keller,* 52 Wn.2d 84, 86, 323 P.2d 231 (1958), it may not impose a criminal contempt sanction unless the contemnor has been afforded those due process rights extended to other criminal defendants. *State v. Boatman,* 104 Wn.2d 44, 46–47, 700 P.2d 1152 (1985); *Browet,* at 219. *See also Hicks ex rel. Feiock v. Feiock,* ___ U.S. ___, 99 L. Ed. 2d 721, 108 S. Ct. 1423 (1988). Because civil and criminal contempt sanctions employ different procedures and are applied for fundamentally different purposes, statutes providing for one kind of contempt cannot be read to circumscribe statutes providing for the other.

■ Applying the foregoing analysis, we conclude that the contempt provision of RCW 13.34.165(2) is punitive, hence

criminal, in nature. By its own terms, the provision is directed toward "punishment," not coercion. It allows for punitive incarceration of up to 7 days when a contemnor is convicted of violating any order issued under the juvenile dependency statute. This provision of the statute provides for determinate jail sentences, allowing the contemnor no opportunity to purge himself of the contempt. Provision for a punitive, noncoercive sentence makes the contempt a crime. *Browet,* at 219.

In arguing that the trial court's power was confined to the sanctions provided in RCW 13.34.165(2), Mr. King suggests in effect that a violation of a court order issued for the protection of minor children can only be punished by a maximum 7–day jail sentence. We find no support for this contention. Rather, this provision is best understood as expanding the power of the court to incarcerate individuals for contempt. Without this statute a court could incarcerate a contemnor only to coerce compliance with its order or to punish for contempt toward a judge holding court; with the statute, however, it may also briefly incarcerate an individual to punish him for failing to comply with any order under the juvenile dependency statute.

Given the express legislative concern for the physical and emotional well being of children that underlies the juvenile dependency statute, RCW 13.34.020, the court's power to coerce compliance is crucial. Since the Legislature did not indicate that the contempt provision in RCW 13.34.165 was to be the exclusive remedy for contempt of court in juvenile dependency cases, we decide not to give it such an interpretation. Construing the statute as an *additional* grant of power to the courts gives greatest effect to the statute's express purpose.

Therefore, under RCW 13.34.070, the court may exercise its broad civil contempt powers to coerce compliance with its order to bring to the court a child who is allegedly the victim of abuse. This power is not limited by the punitive contempt provision of RCW 13.34.165(2). The court may,

thus, incarcerate the responsible adult until he or she complies with the order.

## II

The general civil contempt statute under which Mr. King was properly jailed allows the court to incarcerate a contemnor "until he shall have performed" the action the court has ordered. RCW 7.20.110. Mr. King challenges the duration of his incarceration on the basis that it no longer constitutes coercion. The Court of Appeals agreed, stating that

[a]t some point in time [*sic*] over the past 11 months [of Mr. King's incarceration], the court's attempt to coerce Mr. King to disclose the location of the child has become secondary to the punitive nature of the contempt.

*King,* at 826. The court concluded "as a matter of law" that King's confinement had become punitive and that he must be released. *King,* at 827. This conclusion is wholly unwarranted by the facts before the court and we expressly reject it.

A contemnor should be incarcerated "when no reasonable or effective alternatives are available." *Yamaha Motor Corp. v. Harris,* 29 Wn. App. 859, 866, 631 P.2d 423 (1981). However, a formal finding to this effect is not required, contrary to the suggestion of the Court of Appeals. *King,* at 826. It is necessary only that "the record should demonstrate that all less restrictive alternatives . . . failed." *Norlund,* 31 Wn. App. at 729. *See also Rainier Nat'l Bank v. McCracken,* 26 Wn. App. 498, 516, 615 P.2d 469 (1980). There is sufficient evidence in the record that the juvenile court gave Mr. King every opportunity to comply with its orders before committing him to jail for contempt.

█ Insofar as a civil contempt sanction can only be used to coerce compliance, it logically follows that incarceration for civil contempt can continue only so long as it serves a coercive purpose. At what point incarceration for civil contempt no longer serves a coercive purpose is a matter left to the sound discretion of the trial judge to be decided on a

case–by–case basis. *See Simkin v. United States,* 715 F.2d 34, 37 (2d Cir. 1983); *In re Grand Jury Investigation,* 600 F.2d 420, 428 (3d Cir. 1979). While we do not give a bright–line rule regarding the potential duration of civil contempt incarceration, the following analysis may be helpful for courts to consider in determining whether the incarceration continues to serve a coercive purpose.

The law is well established that a contemnor "will not be held in jail forever" for civil contempt. *Maggio v. Zeitz,* 333 U.S. 56, 76, 92 L. Ed. 476, 68 S. Ct. 401 (1948). Once a court becomes convinced that the contemnor will stead-fastly refuse to comply with the terms of the contempt citation, the court is "obligated to release [him] since incarceration would no longer serve the purpose of the civil contempt order—coercing [compliance]." *United States ex rel. Thom v. Jenkins,* 760 F.2d 736, 740 (7th Cir. 1985).

Mere passage of time, however, does not transform coer-cive contempt into punitive contempt. Although there are no Washington cases directly on point, cases from other jurisdictions support the DSHS argument that length of incarceration per se does not make further incarceration for contempt unlawful. As the court found in *In re Pantojas,* 496 F. Supp. 344, 348 (D.P.R. 1980),

> contemnor's non–cooperation during the term for which he has been imprisoned cannot be found to be sufficient to satisfy the burden in establishing that the confinement has ceased to be coercive and that the metamorphosis transforming it in[to] punitive contempt has taken place.

Other federal rulings reach similar results. *See In re Thornton,* 560 F. Supp. 183 (S.D.N.Y. 1983), upholding the denial of release of a contemnor who had been held for 10 months for refusing to testify before a grand jury. *See also Lambert v. Montana,* 545 F.2d 87 (9th Cir. 1976), uphold-ing a confinement of 16 months. Thus, the Court of Appeals conclusion that Mr. King's confinement of 11 months had become punitive as a matter of law is contrary to general authority.

Although the contemnor's words and conduct may provide important clues regarding the coercive effect of indeterminate jailing, the trial judge is not bound by the contemnor's avowed intention never to comply with the court order. *United States v. Dien,* 598 F.2d 743, 745 (2d Cir. 1979). Even if the court found that the contemnor's present intent is never to comply, the judge may still find that incarceration might cause him to change his mind. *Simkin v. United States, supra* at 37. Incarceration may continue until the trial judge finds, "after a conscientious consideration of the circumstances pertinent to the individual contemnor, that the contempt power has ceased to have a coercive effect . . ." *Simkin,* at 37.

Incarceration for civil contempt obviously loses its coercive effect if the contemnor no longer has the ability to comply with the particular court order he is charged with violating. To continue one's incarceration for contempt for omitting an act he is powerless to perform would make the sanctions purely punitive. *Maggio v. Zeitz, supra* at 72. As soon as it becomes clear to the court that the contemnor cannot obey its original order, the court must release him. *Oriel v. Russell,* 278 U.S. 358, 366, 73 L. Ed. 419, 49 S. Ct. 173 (1929). *See also Smiley v. Smiley,* 99 Wash. 577, 169 P. 962 (1918) (affidavit as to lack of ability to comply being undenied, commitment for contempt by failure to pay alimony held erroneous).

In the context of civil contempt, the law presumes that one is capable of performing those actions required by the court. Thus, inability to comply is an affirmative defense. A contemnor has both the burden of production on ability to comply, *United States v. Rylander,* 460 U.S. 752, 757, 75 L. Ed. 2d 521, 103 S. Ct. 1548 (1983), as well as the burden of persuasion. *Maggio v. Zeitz, supra* at 75–76. The contemnor must offer evidence as to his inability to comply and the evidence must be of a kind the court finds credible.

These principles extend also to situations where the failure to comply with an order may be constitutionally

protected. In this case, for example, Mr. King claims that the court order violates his Fifth Amendment right against self–incrimination. The merits of this claim must be determined initially by the trial court.

In deciding whether a contemnor's incarceration should continue, the trial court should also consider the significance of the ends to be achieved. It is appropriate for the court to balance its interests in enforcing compliance with a particular order and a contemnor's liberty. At some point, extended incarceration due to noncompliance with a relatively minor court order may be an abuse of discretion. In this case, the physical safety and well being of a minor child may be endangered by Mr. King's continued defiance of the court order. It is an example of the kind of factors the court should weigh in deciding whether to continue or terminate incarceration for civil contempt.

The incarcerated contemnor must be afforded the opportunity to purge himself of the contempt and, at regular intervals, to present new evidence tending to show that the confinement has lost its coercive effect or that there is no reasonable possibility of compliance with the court order. *Simkin,* at 37; *Thom,* at 740. Although the Court of Appeals stated that King had not been given an opportunity to purge himself of the contempt citation since his confinement began, *King,* at 827, there is no indication from the record that Mr. King ever brought a motion before the trial court to review his incarceration. In granting King's personal restraint petition without examining the circumstances surrounding his continued incarceration, the Court of Appeals allowed King to be free of the contempt citation without having to prove that it was no longer effective.

### III

The Court of Appeals decision granting Mr. King's personal restraint petition is reversed. The warrant of commitment is reinstated and the cause remanded to the Stevens

County Superior Court for further proceedings consistent with this opinion.

PEARSON, C.J., and BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.