IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Plaintiff,<br><br>                v.<br><br>TITUS DALON EDWARD ARTISON, AKA TITUS DALON ARTISON, TITUS D ARTISON, TITUS D EDW ARTISON, TITUS DELON ANTISON; RICHARD ELLIOT BAGLEY, AKA RICHARD E BAGLEY; CALVIN EUGENE BRIDE, AKA ROBERT EUGENE DEVINE; KELLY RAY CAMPBELL; ALFRED CASTRO, JR; ALYSIA TAUMEE COLEY, AKA ALYSIA T COLEY; CARLOS ARNOLDO CONDE QUEVEDO; MARK ANTHONY DAVIS, AKA MARC ANTHONY DAVID, MIKE ANTHONY JONES; CHRIS FOWLER, AKA CHRISTOPHER FOWLER; HENRY FORD GADDY; ADAM ALEXANDER GREEN; LINDEE RENEE HALLEY, AKA LINDEE R HALLEY; ALAYSIA KYMANI HAMILTON; NICKI WILLIAM JAMES; TYSON LANEL KARCH; DAVID WILLIAM KETRON,  AKA DAVID WILLIAM STALKER; SKIPPER WILLIAM KUZIOR, AKA SKIPPER W KUZIOR; ANGELLA LEITE, AKA ANGELLA DIBELLO LEITE, ANGELLA LIETE; ANNMARIE MORGAN, AKA ANMARIE MORGAN; JUSTINA LYNN OLIVAREZ; ANTONIO RAY PEREZ, AKA ANTONIO R PEREZ; JOSHUA THOMAS PHILLIP, AKA JOSHUA C | No. 87697-0-I<br><br><br><br><br><br><br><br><br>PUBLISHED OPINION |

PHILLIP, JOSHUA THOMAS CAMRON PHILLIP; KENDAL GLEN POSEY, AKA COOL, KENDAL G POSEY, KENDALL GLEN POSEY, KENDALL G POSEY, KENDELL BELL, LITTLE MIKE OG UNKNOWN, OG LITTLEMIKE, UNKNOWN LITTLE MIKE OG, X LITTLE MIKE OG; MARCUS LAMAR PRICE, AKA LOONEY PRICE, MARCUSS PRICE; MIGUEL ANGEL RADILLA GOMEZ, AKA MIGUEL ANGEL RADILLA, MIGUEL ANGEL RADILLA-GOMEZ, MIGUEL ANGEL RADILLIA, MIGUEL A RADILLA; AURELIA HELENA MARCELLE RIOS, AKA AURELIA MARCELA RIOS; ALYCE MARIE RIVERA, AKA ALYCE RIVERA; JACOB JESSE ROBERTS; ALEX DANIEL ROBINSON, AKA BRIAN KEITH BOUCHET; TABER LLEWELYNN ROSENBERRY; JOHN ROY SIMPERS, AKA JOHN R SIMPERS; SHAWNEE TARA STANSBERY, AKA SHAWNEE TERA STANSBERY, SHAWNDEE T STANSBERY, SHAWNEE T STANSBERY; KAITLYN JOANN STITT; SOLOMON Z TAKELE; NICOLE LYNN WALTERS; KEVIN LEE WASHINGTON, AKA KEVIN L WASHINGTON; and JACOB STEVEN WOODBURY, AKA BRANDON JACOBY, JACOB S WOODBURY,

Respondents/Cross Appellants,

PIERCE COUNTY,

Respondent,

DEPARTMENT OF SOCIAL AND HEALTH SERVICES,

Appellant/Cross Respondent.

2

BOWMAN, A.C.J. — On May 4, 2022, the trial court found Calvin Eugene Bride incompetent to stand trial for his second degree assault charge and ordered the Department of Social and Health Services (DSHS) to admit Bride for inpatient competency restoration treatment "by the earlier of 7 days of DSHS' receipt of this order or 14 days from the date of this order." DSHS failed to timely admit Bride for restoration services, so Bride moved for an order directing DSHS to show cause why the court should not hold it in contempt and impose sanctions. Pierce County also moved to intervene on behalf of the Pierce County Jail, which the trial court granted. DSHS responded that it was unable to timely comply with the court's order primarily because of unpredicted exponential growth in restoration treatment orders, lingering effects of COVID-19, demand for bed capacity from nonrestoration patients, and the national health care staffing crisis. The court held DSHS in contempt and imposed sanctions for both Bride and Pierce County. Because no evidence supports the trial court's conclusion that "the willful and intentional inaction of [DSHS] as a whole" caused its failure to comply, we reverse and vacate the trial court's contempt orders.[1]

---

[1] Bride's attorney, Sarah Tofflemire, represented 37 criminal defendants in 45 criminal matters (5 defendants had 2 separate criminal matters and 1 defendant had 4). In each matter, the State charged the defendants with a felony. Between 2021 and 2022, the trial court found the defendants incompetent and ordered inpatient competency restoration treatment at a DSHS facility. Tofflemire simultaneously moved in each case to hold DSHS in contempt for failing to timely admit the defendants for competency restoration treatment. The trial court consolidated the 45 cases for purposes of the contempt proceedings. DSHS then filed its notice of appeal in all 45 cases. Division Two consolidated the appeals and transferred them to this court. The parties agree that the records on appeal in the 45 matters do not meaningfully differ, and that the record in *State v. Bride*, Pierce County Superior Court Cause No. 22-1-00810-7, is the reference case for this consolidated appeal. So, while we discuss only Bride's criminal case, our decision applies to all 45 criminal matters relevant to this appeal.

FACTS

Competency Restoration and the *Trueblood* Litigation

"Incompetency" means "a person lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(19).[2] During a criminal proceeding, if there is "genuine doubt" about whether a defendant is competent to stand trial, the court must appoint or request the secretary of DSHS to designate an expert to evaluate the defendant's mental condition. RCW 10.77.400(b)(i).[3] If the court finds the defendant incompetent based on the expert's report, it must stay the criminal proceedings and determine whether it is likely that their competency can be restored. *See* RCW 10.77.635(1)(a), (b).[4]

If the trial court finds that the defendant is unlikely to regain competency, it must dismiss the proceedings without prejudice and refer the defendant for civil commitment evaluation or proceedings. RCW 10.77.635(1)(d).[5] Otherwise, the court may order the defendant to undergo competency restoration treatment at a facility designated by DSHS. RCW 10.77.635(1)(b). For the defendant to receive the court-ordered inpatient competency restoration services, DSHS must

---

[2] The legislature has amended the statute several times, but the definition of "incompetency" has stayed the same. *Compare* RCW 10.77.010(19), *and* former RCW 10.77.010(6) (1974). In 2025, the legislature reorganized and recodified chapter 10.77 RCW and amended the language of several of the chapter's statutes. LAWS OF 2025, ch. 358, § 2; *see also* LAWS OF 2025, ch. 58. Throughout this opinion, we cite the current statutes if the pertinent language has not changed during the timeframes relevant to the 45 criminal matters involving the 37 defendants at issue in this appeal.

[3] *See also* former RCW 10.77.060(1)(a) (2021).

[4] *See also* former RCW 10.77.084(1)(a), (b) (2016).

[5] *See also* former RCW 10.77.084(1)(d).

extend the defendant "an offer of admission." RCW 10.77.605(1)(a).[6]  Under

RCW 10.77.605(1)(a), DSHS has a "performance target of seven days or fewer"

to extend an offer of admission for inpatient competency restoration services.

The city or county jail must then transport the defendant to a state hospital or

facility designated by DSHS "within one day of receipt" of the offer of admission.

RCW 10.77.625(1).[7]

DSHS has a history of failing to timely admit defendants for competency

restoration evaluations and treatment.  In April 2015, the *Trueblood* court

examined DSHS' shortcomings.  *Trueblood v. Dep't. of Soc. & Health Servs.*, 101

F. Supp. 3d 1010 (W.D. Wash. 2015), *rev'd in part by Trueblood v. Dep't. of Soc.

& Health Servs.*, 822 F.3d 1037 (9th Cir. 2016).  The plaintiffs in *Trueblood*

brought a civil rights class action under 42 U.S.C. § 1983 to compel DSHS[8] to

provide timely competency evaluation and restoration services to class

members.[9]  *Trueblood*, 101 F. Supp. 3d 1010 at 1012-13; *Trueblood*, 822 F.3d at

1041.  The class members were pretrial jail detainees waiting for court-ordered

competency restoration services beyond the orders' dates for admission.

*Trueblood*, 101 F. Supp. 3d at 1014.  After a seven-day bench trial, the district

court found that from 2001 to 2011, Washington saw an 82 percent increase in

---

[6] *See also* former RCW 10.77.068(1)(a) (2015), (2022).

[7] *See also* former RCW 10.77.078(1) (2015).

[8] Although there were other defendants in the *Trueblood* cases, we refer to only defendant DSHS here. *See Trueblood*, 101 F. Supp. 3d at 1012-13.

[9] While the *Trueblood* class members challenged the timeliness of both court-ordered competency evaluations and competency restoration services, we discuss the case primarily as it relates to competency restoration services.  *See Trueblood*, 101 F. Supp. 3d at 1012-13.

demand for competency evaluations.  *Id.* at 1013, 1016.  And that such demand was expected to continue growing at a rate of 8 to 10 percent per year.  *Id.*  The court found that DSHS failed for years "to timely provide competency services pursuant to state law and [has] almost never provided court-ordered competency services within [7] days."  *Id.*  While the state's target wait time for a defendant to receive a hospital bed for competency restoration was 7 days, the average wait time was 20.9 days at one state hospital and 29.8 days at another.  *Id.*

The district court found that hospital staff and bed shortages were the primary causes for delay in competency restoration treatment.  *Trueblood*, 101 F. Supp. 3d at 1018.  And it found that DSHS' "lack of accurate data and timely performance reporting makes it difficult for DSHS to understand and predict demand for its services, to improve its operating policies and procedures, and to adequately plan for the future."  *Id.*  The court determined that "[w]ith appropriate planning, coordination, and resources, none of these barriers prevent DSHS from providing competency services within seven days."  *Id.*  Still, "DSHS consistently ignores court orders to provide class members with services or to admit class members to the state hospitals, even when they have been found in contempt."  *Id.* at 1020.  Based on its 40 listed findings, the district court concluded, in relevant part, that

> incarcerating Plaintiffs and class members for more than seven
> days while they wait for [DSHS] to provide competency services,
> without an individualized determination by a court of good cause to
> continue incarcerating that person, violates the Due Process
> Clause of the Fourteenth Amendment to the United States
> Constitution.

*Id.* at 1023.

The *Trueblood* court entered a permanent injunction, ordering that DSHS admit persons ordered to receive competency restoration services into a state hospital within seven days of the court signing an order for restoration services. 101 F. Supp. 3d at 1023-24. It ordered DSHS to secure sufficient restoration and administrative staff as well as enough bed space and facilities to allow state hospitals to admit class members within seven days. *Id.* at 1024. The court also ordered DSHS "to prepare a long-term plan on how [it] will continue to provide services within seven days, even as demands for such services continues to grow." *Id.* And because DSHS had "demonstrated a consistent pattern of intentionally disregarding court orders," the court appointed a monitor to oversee its implementation of the injunction's requirements. *Id.*

The court further ordered DSHS to file a monthly report with the monitor that included, among other things, its current data on providing competency services and its plans for continued compliance. *Trueblood*, 101 F. Supp. 3d at 1024-25. Based on DSHS' monthly reports, the monitor would file a quarterly public report with the court, summarizing DSHS' actions, providing its opinion on DSHS' progress, and giving recommendations for future compliance.[10] *Id.* at 1025.

After the federal injunction, DSHS still failed to provide timely competency restoration services. *Trueblood v. Dep't. of Soc. & Health Servs.*, No. C14-1178 MJP, 2016 WL 4533611, *2 (W.D. Wash. 2016) (court order). On DSHS' motion to modify the permanent injunction to extend its compliance deadline, the district

---

[10] DSHS appealed the district court's opinion only as it related to timely competency evaluations. *Trueblood*, 822 F.3d at 1039-40.

court stated that DSHS has "failed to satisfy the Court's mandate, [has] failed to meet the goals [it] laid out in [its] long-term plan, and [has] failed to meaningfully improve the lives of class members, who continue to languish in jail while waiting for services." *Id.* at *1, *4. The court granted the motion to extend the compliance deadline and entered new orders outlining actions that DSHS must take to reduce wait times for competency restoration. *Id.* at *5-*6.

In 2018, after ongoing federal contempt proceedings, the parties entered into a court-approved settlement agreement to bring DSHS into substantial compliance with the district court's orders.[11] To reach the agreement, the parties "held dozens of meetings with hundreds of system partners over the six-month negotiations period," including with class members, state legislators, law enforcement, prosecuting and defense attorneys, and clinicians.

As part of the agreement, DSHS would support legislative changes to reduce the number of people ordered into competency restoration and to use community-based restoration services. It also agreed to "seek funding and statutory changes to implement a phased roll out of community outpatient restoration services in targeted areas." DSHS also said it would seek funding for a "forensic navigator," who would assist class members with accessing services related to diversion and outpatient competency restoration. And it agreed to "open additional forensic beds" at the state hospitals based on funding authorized in the 2018 budget. Among other things, DSHS agreed to seek funding to increase overall capacity for crisis stabilization units and triage

---

[11] As relevant to this case, we include the parties' agreements related to only competency restoration services.

8

facilities, hire workforce development specialists, and create co-responder programs that provide law enforcement agencies with mental health professionals to assist officers in field responses. It also agreed to develop a model identifying "those most at risk of near-term referral for competency restoration."

Under the settlement agreement, implementation of the programs and services would occur in at least three phases. DSHS would use an "oversight structure" to implement the agreement, made up of a "General Advisory Committee" and a small "Executive Committee." The General Advisory Committee would provide community feedback, flag issues, review data, and make recommendations to the Executive Committee. The Executive Committee would then make decisions and recommendations to the federal court. DSHS also agreed to develop implementation plans using input from the plaintiffs' counsel and the court monitor. The plans would identify the tasks necessary to fulfill the commitments, set timelines, assign responsibilities, develop collaboration models, and more.

The settlement agreement states that it will terminate when DSHS shows "substantial compliance" with certain requirements, including admitting class members ordered to receive inpatient restoration services within the shorter of (1) 7 days of DSHS receiving the inpatient restoration order or (2) 14 days of the criminal court ordering inpatient restoration treatment.

## 2022 Contempt Proceedings

On March 16, 2022, the State charged Bride with second degree assault. On May 4, the trial court found Bride incompetent and entered an order for competency restoration treatment. It ordered that DSHS take custody of Bride for inpatient evaluation and treatment. The order stated that Bride must be "transported and admitted to the treatment facility by the earlier of 7 days of DSHS' receipt of this order or 14 days from the date of this order as required by statute and case law," including the *Trueblood* cases.

On August 24, 2022, Bride was still in jail and DSHS had not offered him admission for competency restoration services. So, Bride moved for an order directing DSHS to show cause why the trial court should not hold DSHS in contempt and impose sanctions. Bride argued he "has not been admitted to Western State Hospital [(WSH)] and remains incarcerated at the Pierce County Jail where [he] is not receiving proper treatment." The court granted Bride's motion and set a show cause hearing for September 14.

On September 9, 2022, DSHS responded to the motion for contempt. DSHS pointed out that it did not receive the restoration order until September 1 and had not calculated an admission date yet. And it argued it should not be held in contempt because it is unable to admit Bride at this time. DSHS also asserted that RCW 10.77.605(9)[12] and sovereign immunity barred the court from imposing contempt sanctions against DSHS for its failure to provide competency

---

[12] *See also* former RCW 10.77.068(9) (2022), .068(5) (2015). RCW 10.77.605(9) prohibits contempt sanctions "related to the timeliness of competency to stand trial services" outlined in the statute.

restoration treatment within the statutory timelines. And it argued that sanctions are unnecessary given the federal court's existing oversight of its competency restoration services. It explained that DSHS is under a federal injunction, must comply with a negotiated settlement agreement, and the federal court continues to impose contempt sanctions against it.

With its response, DSHS submitted a declaration from Dr. Thomas Kinlen, the director of the Office of Forensic Mental Health Services at DSHS. Dr. Kinlen is responsible for the "delivery of forensic services," including competency restoration policy development and collaboration with residential treatment facilities for competency restoration. Dr. Kinlen offered four reasons why the wait time for competency services exceeds seven days: (1) unpredicted, exponential growth in restoration treatment orders, (2) lingering impacts of COVID-19 restrictions, (3) the effect of an increasing number of felony conversion cases[13] on the bed capacity for competency restoration patients, and (4) the national health care staffing crisis affecting DSHS operations.

Dr. Kinlen explained that over the past nine fiscal years (2013 to 2022), there was an approximate 145 percent increase in competency restoration orders, which greatly exceeded the expected increase. While DSHS' "Research and Data Analysis" group tried to "correlate this rise in competency court orders to other data points, including population growth, arrest rates, crime rates, and use of Medicaid services," the number of competency orders surpassed the

---

[13] A felony conversion case refers to an order for admission to a state hospital for civil commitment evaluation following dismissal of felony criminal charges. *See* RCW 10.77.645(5); *Spokane County v. Meneses*, 3 Wn.3d 99, 101 n.4, 546 P.3d 1012 (2024); *see also* former RCW 10.77.086(3) (2022).

increase in all other factors. So, Dr. Kinlen explained, with "no discernable link between these other factors, or other causal factors, it remains very difficult for [DSHS] to predict the future rate of growth."

Dr. Kinlen said the rapid demand for restoration services has "exceed[ed] the large number of beds added to the forensic system." And he noted that adding bed capacity is usually a "multi-year process" that requires obtaining funding, renovating or constructing spaces, and hiring and training personnel. Dr. Kinlen also explained that DSHS is required to admit several populations at its facilities and that felony conversion patients "are increasingly ordered into beds needed to provide services for competency evaluation and restoration." For example, in August 2022, there were approximately 136 felony conversion patients occupying forensic beds at WSH. These constraints, among others, left DSHS unable to provide timely restoration services.

Dr. Kinlen outlined DSHS' efforts to increase bed capacity for competency services. In 2016, DSHS opened two new treatment facilities—the Yakima Competency Restoration Center with 24 beds and the Maple Lane Behavioral Health and Treatment Center with 30 beds. Between 2018 and 2021, WSH and Eastern State Hospital (ESH) added approximately 150 forensic beds combined. Dr. Kinlen said there were also several new facilities in development that would further increase bed capacity in coming years.

Dr. Kinlen's declaration also identified DSHS' efforts to invest in systemic reform, criminal justice system diversion, and outpatient competency services. In July 2016, DSHS "again increased" the number of staff responsible for providing

competency services. DSHS also developed an "admissions algorithm," per *Trueblood*'s order, to "meet the rising demand for competency services." Beginning in 2018, admissions staff used its data to create a bed allocation model intended to "maximize bed turnover." DSHS also has a system for "expedited admission" for competency services, where DSHS can move up a defendant's name on the bed waitlist if they meet certain "behavioral functioning" criteria. And DSHS has instituted several reforms and new policies aimed at discharging the not-guilty-by-reason-of-insanity (NGRI) population, who competes for beds with those in need of competency restoration.[14]

Further, Dr. Kinlen said that DSHS has worked continuously with the legislature to obtain additional funding for programs and facilities that impact competency restoration services. In 2019, DSHS awarded funds to King, Spokane, and Columbia Counties to continue their "prosecutorial diversion programs," which divert people with behavioral health conditions from the criminal justice system and competency services into outpatient behavioral health services. As part of the budget appropriations for the 2019 to 2021 fiscal biennium, the state allocated "significant" funds toward implementing the settlement agreement and reducing restoration wait times, including $1.89 million to develop outpatient competency programs, $10.23 million to expand crisis triage and stabilization services to divert people from restoration, and $27.0 million to increase forensic bed capacity. Dr. Kinlen said DSHS has made "good

---

[14] Data from 2022 showed that the reforms resulted in "increasing the number of NGRI patients receiving final discharges from [DSHS] authority by 186 percent."

faith efforts to admit all defendants awaiting competency services at the earliest date possible" and "will continue to make such efforts going forward."

On September 13, 2022, Bride filed a memorandum in support of his motion for contempt, requesting that the trial court impose remedial sanctions up to $1,000 for each additional day he remains in jail not receiving restoration services. Bride argued that the court has authority under chapter 7.21 RCW to impose sanctions for DSHS' failure to comply with the court's competency restoration order and that sanctions will have a "coercive" effect.

The same day, Pierce County also moved to hold DSHS in contempt for failing to timely provide Bride restoration services. It argued that the Pierce County Jail has had to "house and provide services for [Bride] until DSHS transports [him] for restoration." And it requested reimbursement through compensatory remedial sanctions in the amount of $259.79 for each day that Bride remained in the Pierce County Jail after DSHS' deadline until DSHS transports him for restoration.

On September 14 and 19, 2022, the trial court held the show cause hearing on Bride's motion for contempt. Bride called three witnesses to testify—Dr. Kinlen, Mark Thompson, and Dr. George Petzinger.

Dr. Kinlen testified consistently with his declaration, addressing the challenges DSHS has faced with providing timely competency restoration treatment and its efforts to comply with court orders. When asked why "the process of tracking incoming orders for restoration seems to be lacking," Dr. Kinlen said that sometimes DSHS does not receive the restoration orders. He

14

also acknowledged that DSHS has an "administrative staffing problem," so it is "behind" on processing the restoration orders it does receive. Dr. Kinlen explained that in response, DSHS recently filled vacancies, approved overtime, and "double-fill[ed]" some positions "to make sure that we don't have a backlog of cases that have not yet been processed."

Bride's attorney asked Dr. Kinlen to describe how DSHS' algorithm for admission to competency restoration works. Dr. Kinlen said the algorithm considers "three main areas": (1) legal authority, (2) the number of days a defendant has been waiting, and (3) their unique circumstances. He explained that the algorithm is intended to help organize the waitlist when "we don't have enough inpatient beds and an overwhelming number of individuals needing those beds." And that the federal court is "[h]eavily involved" in reviewing DSHS' expected demand for beds and its plans for bed capacity.

Even with the implementation of the algorithm, Dr. Kinlen said DSHS did not expect the "post-pandemic increase" in competency restoration demand that occurred after the COVID-19 pandemic. And he mentioned other factors hampering its intake process, like the residual effect of slowed admissions after the pandemic, the legally mandated closure of some civil units at state hospitals, and a seemingly "sicker population coming through . . . competency."

But Dr. Kinlen said DSHS is "always looking into adjustments" and "trying to add . . . more staff, more evaluators, . . . more beds, and, of course, more staff associated with those beds." Dr. Kinlen testified:

> I wish I could be here today saying we are able to comply with all of
> [the orders], but unfortunately, we just do not have the capacity at this

15

time for inpatient services, but it's not anything that we disregard or don't want to do. We want to be an added value, not a hindrance to the system, so our goal is to try to comply with every court order, but unfortunately, we're just not able to do that.

Thompson testified next. He is the chief executive officer of the Gage Center of Forensic Excellence (Gage Center) at WSH, giving him "operational authority over the [hospital's] forensic wards." Thompson testified that staffing shortfalls at WSH have been a consistent problem since before he began working there in 2016. And that between 2016 and the time of his testimony, there has not been a time when "every ward was fully staffed." He testified that "we are mandating overtime for staff and continuing to do what we can to stay at functional, full capacity." Thompson also said there have been pay increases for staff since 2016. For example, psychologists received a 12 percent increase and psychiatrists received an 8 percent increase in 2022. But he noted that "it remains difficult to keep pace with independent private hospitals," which can pay more.

Like Dr. Kinlen, Thompson explained the difficulty with felony conversion patients taking up bed space that would otherwise be provided to civil restoration patients. But he pointed out that in December 2021, after some beds were added in different facilities, WSH reduced its total civil patient population in the Gage Center to less than 10. Thompson testified that "everything that we've been doing is to try [to] utilize every possible bed that we can to fulfill our mission, and I think . . . we are all as frustrated as many are in the criminal justice community that we can not [sic] operationalize our mission."

16

On September 19, the second day of the hearing and before Bride called his last witness, Pierce County moved to withdraw its motion for contempt. It notified the court that it would be moving to intervene instead. The court granted the motion to withdraw and set a hearing on the motion to intervene for October 3, 2022.

Dr. Petzinger, the chief medical officer of the Gage Center, then testified. DSHS' attorney asked Dr. Petzinger about his efforts "to address the backlog issue" at WSH. Dr. Petzinger responded that about a year earlier, he reorganized the admissions team, provided a new administrator, and started having daily meetings with the team. He testified that he has "tried to cut out all of the unnecessary duties for the admissions team, so when we have the capacity, we can bring patients in as quickly as possible." Dr. Petzinger also said he reached out to several local jails about how to "support them to bring our patients in as soon as possible."

DSHS' attorney asked Dr. Petzinger how a contempt finding impacts who to admit next for treatment. Dr. Petzinger said, "It doesn't come into the calculation." He explained, "We follow the waitlist, and the fines don't enter into the waitlist at all." He said that whether a case has fines on it does not impact how quickly a person is admitted because DSHS "admit[s] according to the law and the waitlist."

At the end of the testimony, the parties agreed to reserve argument on Bride's motion for contempt until after the court ruled on Pierce County's motion to intervene. On September 22, 2022, Pierce County filed its motion to intervene

17

"for the limited purpose of seeking costs associated with DSHS'[ ] contempt for failure to timely transport defendant for competency restoration."[15] The trial court then held a hearing on October 3, 2022. Immediately following argument, it granted Pierce County's motion to intervene. As part of its oral ruling, it found RCW 10.77.605(9) unconstitutional. The court then heard argument on Bride's motion for contempt and made an oral ruling, holding DSHS in contempt.[16]

On October 26, 2022, the court entered a written contempt order on Bride's motion. It found that DSHS did not admit Bride within 14 days after the court signed the restoration order.[17] It found that "shortages of staff and bed space which significantly contribute to [DSHS'] failure to comply with the court's order for restoration treatment have been problems which have been known and persisted for over [10] years." The court determined that DSHS willfully and intentionally failed to comply. It found that although "[n]o single actor at [DSHS] individually failed to comply with the order for restoration, . . . the willful and intentional inaction of [DSHS] as a whole caused the failure to comply." And it concluded that DSHS did not show it is "unable to comply with the court's [restoration] order." It ordered that beginning on the 15th day after the court's order, DSHS will be sanctioned $300 each day it fails to admit Bride for inpatient

---

[15] In supplemental briefing, Pierce County clarified that it was seeking "a separate order of contempt under RCW 7.21.030(3)," the contempt of court act, based on the recent "testimony and proceedings on contempt."

[16] The court also found that DSHS' failure to timely admit four of the defendants for restoration violated their due process rights. It dismissed those cases without prejudice and referred them for evaluation under the civil commitment proceedings.

[17] It also found that although the court ordered DSHS to admit Bride for competency restoration services on May 4, 2022, DSHS did not receive the order until September 1, 2022.

restoration treatment. The court ordered that DSHS could purge its contempt by admitting Bride for inpatient restoration treatment.

On November 21, 2022, the trial court held a hearing for entry of the orders on Pierce County's motion to intervene and the court's finding of contempt, including costs. In its contempt order, the court found that the "Pierce County Jail has incurred costs due to the failure of [DSHS'] transport for competency restoration." It ordered that DSHS reimburse the Pierce County Jail at a daily rate of $259.79 "for each day the defendant was in the custody of [the] jail while awaiting transport," beginning 14 days after the court entered the competency restoration order. And it ordered DSHS to reimburse the Pierce County Jail "for each day after the entry of this Order that the defendant is not transported until the defendant has been released from [the] jail."

On November 23, 2022, DSHS appealed the trial court's October 26 contempt order on Bride's motion, the November 21 order permitting Pierce County to intervene, and the November 21 contempt order granting Pierce County costs. The same day, Pierce County moved to correct the trial court's November 21 contempt order to accurately reflect its oral ruling that RCW 10.77.605(9) is unconstitutional.

On August 1, 2023, the trial court entered a "Corrected Order of Contempt on Pierce County Motion." It included its oral finding that "RCW 10.77.[605](9) is unconstitutional beyond a reasonable doubt to the extent it strips a court[']s contempt power and authority to enter contempt sanctions under chapter 7.21 [RCW]." The court also entered an order "on the issue of whether or not there's

19

double recovery and where the judgment money should be paid."  It ordered that based on "the abundant case law limiting double recovery," DSHS will pay the $300-per-day sanction per the October 26, 2022 contempt order to the court's registry.  Then, from the registry, the court will pay Pierce County "the appropriate amount" due under the November 21, 2022 contempt order.

DSHS appeals the court's intervention and contempt orders in favor of Bride and Pierce County, and Bride cross appeals the court's August 1 orders.

ANALYSIS

DSHS argues the trial court abused its discretion by holding it in contempt and imposing sanctions.  It contends the evidence showed it was unable to comply with the court's restoration order.[18]  And it argues that even if the facts in the record support the contempt finding, RCW 10.77.605(9) bars the trial court from imposing contempt sanctions for its failure to timely provide competency restoration services.

1.  Contempt Finding

We review contempt rulings for abuse of discretion.  *Dep't. of Ecology v. Tiger Oil Corp.*, 166 Wn. App. 720, 768, 271 P.3d 331 (2012).  A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons.  *Holiday v. City of Moses Lake*, 157 Wn. App. 347, 355, 236 P.3d 981 (2010).  A court's decision is manifestly unreasonable if it falls outside

---

[18] Bride and Pierce County argue that DSHS waived this argument by not challenging specific findings in its opening brief.  Because DSHS specifically challenges the trial court's finding that it was able to timely comply with the restoration order to admit Bride and its conclusion that the failure to do so was "willful and intentional," DSHS sufficiently challenges the court's determinations, and we address the argument on its merits.

the range of acceptable choices, given the facts and legal standard. *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013). And its decision is based on untenable grounds or untenable reasons if it applies the wrong legal standard or relies on unsupported facts. *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

We review a trial court's findings in support of a contempt order for substantial evidence. *See In re Marriage of Rideout*, 150 Wn.2d 337, 351-52, 77 P.3d 1174 (2003) (affirming Division Two's decision that sufficient evidence supported the trial court's findings of contempt based on an entirely documentary record where an outcome determinative credibility issue was before the court in a contempt proceeding). Substantial evidence is evidence sufficient to persuade a rational, fair-minded person of the truth of the finding. *Blackburn v. Dep't of Soc. & Health Servs.*, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016). We will uphold a trial court's contempt ruling if we can find a proper basis for contempt. *Tiger Oil*, 166 Wn. App. at 768.

"Contempt of court" is the "intentional . . . [d]isobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(b). The primary purpose of civil contempt proceedings is to coerce a party to comply with an order. *Smith v. Whatcom County Dist. Ct.*, 147 Wn.2d 98, 105, 52 P.3d 485 (2002). The party moving for contempt has the burden of proving contempt by a preponderance of the evidence. *In re Marriage of James*, 79 Wn. App. 436, 442, 903 P.2d 470 (1995). Once the moving party makes a prima facie showing of contempt, the contemnor has an opportunity to show cause why it should not be

held in contempt by producing evidence of legitimate reasons for failing to comply with the court's order. *See id.*

The law presumes that "one is capable of performing those actions required by the court." *In re Pers. Restraint of King*, 110 Wn.2d 793, 804, 756 P.2d 1303 (1988). But a contemnor can rebut that presumption by showing it was unable to comply with the court order. *Id.* The contemnor has the burden of production and the burden of persuasion to show its "inability to comply." *Id.* It must "offer evidence as to [its] inability to comply and the evidence must be of a kind the court finds credible." *Id.* If the contemnor satisfies its burdens, the trial court cannot hold it in contempt. *See id.* (inability to comply is an affirmative defense in civil contempt proceedings). But if the court finds "the person has failed or refused to perform an act that is yet within the person's power to perform," it may hold the person in contempt and impose remedial sanctions. RCW 7.21.030(2). Courts impose remedial sanctions "for the purpose of coercing performance." RCW 7.21.010(3).

Here, the evidence shows that DSHS failed to comply with a lawful court order. On May 4, 2022, the trial court ordered DSHS to transport and admit Bride to a treatment facility for competency restoration services within 7 days of DSHS' receipt of the order or 14 days from the order's date, whichever was earlier. But by August 2022—more than 3 months after the court's order—DSHS still had not admitted Bride for restoration treatment. So, the trial court granted Bride's motion for an order to show cause why it should not dismiss his criminal charge and hold DSHS in contempt.

22

At the show cause hearing,[19] DSHS produced evidence that it was unable to comply with the court's order. Dr. Kinlen testified that DSHS made significant efforts to provide timely restoration services, but four main barriers prevented it from doing so: (1) unpredictable, exponential growth in restoration treatment orders, (2) backlogged waitlists from COVID-19 restrictions, (3) increased demand for beds in felony conversion cases that decreased bed capacity for competency restoration patients, and (4) the national health care staffing crisis. He explained that between fiscal years 2013 and 2022, there was an approximate 145 percent increase in competency restoration orders, which greatly exceeded expectations. And that DSHS' Research and Data Analysis group was unable to determine any causal factors that might help predict the future growth rate of competency restoration orders.

DSHS also showed that the rapid demand for restoration services has exceeded the number of beds in the forensic system. And that adding bed capacity usually takes several years. Dr. Kinlen and Thompson both emphasized DSHS' difficulties with having to allocate bed space to felony conversion patients that are otherwise needed for civil restoration patients. And they testified that national staffing shortages are an added challenge to providing timely restoration services that affects both DSHS' administrative staff and WSH's medical staff.

And Dr. Kinlen, Thompson, and Dr. Petzinger all testified about DSHS' extensive efforts to resolve these problems and comply with competency

---

[19] Bride's attorney clarified that "the only issue the defense is addressing today is contempt," not the motion to dismiss the criminal charge.

restoration orders. Dr. Kinlen testified that DSHS increased bed capacity for competency services, adding approximately 150 forensic beds combined at WSH and ESH between 2018 and 2021. He also said there were several new facilities in development that would further increase bed capacity. DSHS also developed an admissions algorithm to meet the rising demand for competency services when DSHS does not "have enough inpatient beds and an overwhelming number of individuals needing those beds." And the admissions staff use the algorithm's data to create a bed allocation model intended to maximize bed turnover. Further, the federal court is "[h]eavily involved" in reviewing DSHS' plans for bed capacity and expected demand with regular status hearings.

As for obtaining further financial resources, Dr. Kinlen testified that DSHS has worked continuously with the legislature to obtain additional funding for programs and facilities related to competency restoration services. In 2019, DSHS awarded funds to some counties for their prosecutorial diversion programs aimed at placing those with behavioral health conditions in outpatient behavioral health services. And in the 2019 to 2021 fiscal biennium, the state allocated over $75 million toward implementing the *Trueblood* settlement agreement and reducing competency restoration wait times, including $27 million to increase forensic bed capacity.

DSHS also showed that it tried to resolve its staffing and backlog problems by filling vacancies, mandating overtime, and double filling some positions to process cases more quickly. Thompson testified that WSH has provided pay increases to psychiatrists, psychologists, and onboard staff. Still,

24

Thompson noted that it is difficult to compete with private hospitals that can pay more. Dr. Petzinger testified that as chief medical officer of the Gage Center at WSH, he has addressed the competency restoration backlog issue by reorganizing the admissions team and scheduling daily meetings with the team. He attested his goal was to "cut out all of the unnecessary duties for the admissions team, so when we have the capacity, we can bring patients in as quickly as possible." Even so, Thompson testified that WSH still cannot "operationalize [its] mission." Dr. Kinlen testified to the same, stating that DSHS' "goal is to try to comply with every court order, but unfortunately, we're just not able to do that."

The trial court did not question the credibility of DSHS' evidence. And it acknowledged that "[n]o single actor at [DSHS] individually failed to comply with the order for restoration." Still, it rejected the argument that DSHS was unable to timely comply with the court's order. The court concluded that "the willful and intentional inaction of [DSHS] as a whole caused the failure to comply." But no witness testified that DSHS intentionally failed to perform an act that would have enabled it to provide timely competency restoration services to Bride. Neither did the court identify any intentional dilatory conduct by DSHS. Indeed, the testimony showed that DSHS made significant efforts to provide timely restoration services, but several structural barriers and resource limitations outside of its control left it unable to do so. As a result, the trial court's ruling is unsupported by facts in the record and amounts to an abuse of discretion.

We remand to reverse and vacate the trial court's contempt orders for Bride and Pierce County.[20]

2. RCW 10.77.605(9)

DSHS further argues that even if a contempt finding was warranted, the trial court erred by imposing sanctions because RCW 10.77.605(9) "is a statutory bar to the recovery of contempt sanctions" for failure to timely provide restoration services. Although a finding of contempt was not warranted here, we disagree with DSHS, and choose to address the merits of its argument.

A court's authority to impose contempt sanctions is a question of law we review de novo. *In re Int. of Silva*, 166 Wn.2d 133, 140, 206 P.3d 1240 (2009). We also review questions of statutory interpretation de novo. *Gronquist v. Dep't of Corr.*, 196 Wn.2d 564, 570, 475 P.3 497 (2020). The purpose of statutory interpretation is to determine and give effect to the legislature's intent. *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013). When interpreting a statute, we begin with the statute's plain language and ordinary meaning. *Gronquist*, 196 Wn.2d at 570.

> When possible, we derive legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the

---

[20] Because we conclude that the trial court abused its discretion by holding DSHS in contempt, we do not address DSHS' argument that the trial court erred by permitting Pierce County to intervene and imposing retroactive coercive sanctions or Bride's cross appeal that the court erred by refusing to issue both coercive and compensatory sanctions. But we note that under RCW 7.21.030(1), a person may move for remedial contempt sanctions only if they are "*aggrieved* by a contempt of court in the proceeding to which the contempt is related." (Emphasis added.) And the court made no finding that Pierce County was an aggrieved party. We also note that the plain language of RCW 7.21.030(3) authorizes the court to order compensatory sanctions "in addition" to coercive sanctions.

provision is found, related provisions, and the statutory scheme as a whole.

*Evans*, 177 Wn.2d at 192. We interpret statutes to give effect to all its language, with no portion rendered meaningless or superfluous. *Gronquist*, 196 Wn.2d at 571. Plain language that is not ambiguous does not require statutory construction. *Evans*, 177 Wn.2d at 192.

As discussed, RCW 10.77.605 sets performance targets and maximum time limits for DSHS to extend criminal defendants offers of admission for inpatient competency restoration services.[21] The statute sets a performance target of 7 days or fewer and a maximum limit of 14 days from the court's restoration order for DSHS to offer a defendant in pretrial custody admission to restoration treatment. RCW 10.77.605(1)(a), (2)(a). Under subsection (3), the legislature recognized that

> these targets may not be achievable in all cases, but intends for [DSHS] to manage, allocate, and request appropriations for

---

[21] The legislature adopted former RCW 10.77.068 in 2012 and imposed "performance targets" for DSHS to admit defendants for competency services within "seven days or less" of receiving notice from the court. LAWS OF 2012, ch. 256, § 2; former RCW 10.77.068(1)(a) (2012). But subsection (5) prohibited contempt sanctions based on the statute. Former RCW 10.77.068(5) (2012). After the *Trueblood* litigation, the legislature amended former RCW 10.77.068 several times. In 2015, it imposed a new "maximum time limit" for DSHS to admit defendants for restoration treatment that mirrored the deadlines set out by *Trueblood*. Former RCW 10.77.068(1)(a)(ii) (2015). Still, the legislature chose to keep the prohibition on contempt sanctions largely unaltered. *Compare* former RCW 10.77.068(5) (2015), *and* former RCW 10.77.068(5) (2012). In 2022, it renumbered subsection (5) to subsection (9). LAWS OF 2022, ch. 288, § 3. The legislature amended the statute again in 2023, and in 2025, recodified it as RCW 10.77.605. LAWS OF 2023, ch. 453, § 4; LAWS OF 2025, ch. 358, § 2. But again, the legislature did not substantially amend the language prohibiting contempt sanctions based on the statute under chapter 7.21 RCW. *Compare* RCW 10.77.605(9), *and* former RCW 10.77.068(5) (2015).

resources in order to meet these targets whenever possible without sacrificing the accuracy and quality of competency services.

RCW 10.77.605. And in subsection (9), the legislature made clear that sanctions cannot flow from a violation of these deadlines. *Id.* RCW 10.77.605(9) provides:

> This section does not create any new entitlement or cause of action related to the timeliness of competency to stand trial services, nor can it form the basis for contempt sanctions under chapter 7.21 RCW or a motion to dismiss criminal charges.

DSHS asserts that RCW 10.77.605(9) forecloses contempt sanctions "based on competency restoration timelines." But the statute's reach is not so broad. The provision's plain language bars imposing sanctions for a contempt finding based on a violation of the deadlines established in only RCW 10.77.605. RCW 10.77.605(9). It does not bar sanctions arising from a contempt order for failure to comply with deadlines separate from the statute.[22] And here, the trial court ordered DSHS to transport Bride for restoration services under both the timelines established by statute and those necessary to comply with due process

---

[22] Division Two of this court recently reached the same conclusion in *State v. Lockhart*, 34 Wn. App. 2d 596, 569 P.3d 1110 (2025). It held that former RCW 10.77.068(9) (2022) precluded the trial court from imposing contempt sanctions when its restoration order and contempt finding were "squarely based on failure to follow the statute, not a more general violation of a court order." *Id.* at 607-08. The restoration order at issue made "no reference to the *Trueblood* litigation or any other source of authority." *Id.* at 607. Division Two stated that its conclusion was "limited to this specific order" and that its opinion does not strip trial courts of their ability to sanction DSHS for a failure to timely provide competency restoration. *Id.* at 607-08. It explained that the trial court's ability to impose such contempt sanctions turns on whether the restoration order is "narrowly tied to" a violation of former RCW 10.77.068 (2022) or is "based more generally on a violation of other aspects of a court order." *Id.* at 611-12.

as defined by *Trueblood.*  As a result, RCW 10.77.605(9) did not bar the court from imposing contempt sanctions.[23]

Because the trial court abused its discretion by holding DSHS in contempt, we reverse and vacate the trial court's contempt orders.

_____, ACJ

WE CONCUR:

_____, J.        _____, J.

---

[23] Because RCW 10.77.605(9) did not bar the trial court from exercising its statutory contempt powers to impose sanctions, we do not address the court's ruling that the statute "is unconstitutional beyond a reasonable doubt to the extent it strips a court[']s contempt power and authority to enter contempt sanctions under chapter 7.21 [RCW]."  And because the trial court had statutory authority to impose contempt sanctions under chapter 7.21 RCW, we need not reach the parties' arguments about whether the court could invoke its inherent contempt authority to impose such sanctions. *See In re Dependency of A.K.*, 162 Wn.2d 632, 647, 174 P.3d 11 (2007) (explaining that courts may not exercise their inherent contempt power unless the statutory procedures and sanctions are inadequate).